**UNITED STATES of America, by John N. MITCHELL, Attorney General, Plaintiff,**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, an unincorporated association, et al., Defendants.**

**Civ. A. No. 69–B–3.**

United States District Court, S. D. Texas, Brownsville Division.

Nov. 12, 1971.

John N. Mitchell, Atty. Gen., Jerris Leonard, Asst. Atty. Gen., David L. Rose, Andrew J. Ruzicho and John W. Davis, Attys., Department of Justice, Washington, D. C., for plaintiff.

Brock & Williams, Warner F. Brock, Houston, Tex., for International Longshoremen's Ass'n, South Atlantic and Gulf Coast Dist., International Longshoremen's Ass'n, and Locals 1372, 872, 1231, 1271, 1330, 1331, 1525, 1581, 325, 1306, 1610, 851, 1225, 1241, 1245, 1281, 1723, 1818, 636, 991, 1405, 1406, 440, 1029, 1175, 341, 814, 1758 and 1763, I.L.A.

Mandell & Wright, Herman Wright, Houston, Tex., for Locals 1367, 307, 1576, 1224 and 1280, I.L.A.

Michael Crawford, Houston, Tex., for Local 329, I.L.A.

Dixie, Wolf & Hall, Chris Dixie, Houston, Tex., for Local 1273, I.L.A.

D. J. Lerma, Brownsville, Tex., for Local 1368, I.L.A.

## MEMORANDUM

GARZA, District Judge.

On January 20, 1969, in which was probably the last case filed by the Johnson administration, then Attorney General Ramsey Clark filed the above suit under Title VII of the Civil Rights Act of 1964, alleging a pattern or practice of discrimination on grounds of race, color and national origin, in violation of said Act. The Defendants included the International Longshoremen's Association (hereinafter called the I.L.A.), the South Atlantic and Gulf Coast District of the I.L.A. (hereinafter referred to as District), and thirty-seven local general cargo longshoremen's unions chartered by the I.L.A., all of whom are labor organizations within the meaning of 42 U.S.C. § 2000e(d), and all of whom are engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(e). As has been stated, the United States has alleged that the Defendant unions have engaged in a pattern or practice of discrimination on the grounds of race and national origin, more particularly that the Defendants have maintained local unions, hiring halls and gangs, which were classified and segregated on the grounds of race and national origin, and that this has resulted in the denying of equal working opportunities to Negro and Mexican-American longshoremen, because of their race or national origin, and that the District, in its contract negotiations with employers, has caused such employers to also discriminate on the grounds of race and national origin. The United States asks this Court to order a merger of the segregated locals and the discontinuance of separate locals, hiring halls and gangs based upon race and national origin, and

for such further steps as would be necessary and proper.

With the exception of two Negro locals, one in Galveston and one in Brownsville, both with special problems that will be referred to further on in this opinion, all Defendants are opposed to the merger of locals that the Government proposes, and deny any violation of the Civil Rights Act of 1964.

It took some time to serve all Defendants and for answers to be filed, and with the exception of a few depositions and communications between the United States and some of the attorneys for the Defendants, very little was done in preparation for the trial of this case, until this Court, on May 12, 1970, set a pretrial in this cause to be held in Houston, Texas, on Tuesday, June 23rd, and the trial of the same was set for Houston, as a place within this District convenient to counsel and witnesses, for July 13, 1970.

In preparation for trial, the depositions of officials of every one of the Defendants were taken.

At the pre-trial on June 23, 1970, the parties agreed to stipulate to as many facts as possible to shorten the time of trial. This was done and an extensive stipulation was filed by the parties, which has been very helpful to the Court.

At the pre-trial, the Defendants urged this Court to dismiss the cause of action on the grounds that the attempt by the United States to merge the local longshoremen's unions was a violation of their constitutional right of association under the First Amendment. The Court took the motion to dismiss on these grounds under consideration, and said it would carry it along with the case. The motion to dismiss on these grounds is now denied.

The Court heard testimony in this cause from July 13th through July 17, 1970, and from September 9th to September 17, 1970. During the trial, hundreds of exhibits, some of them rather bulky, were received in evidence, and the Court has had to read the same and as-

similate their contents. The parties, at the conclusion of the trial, were allowed to file briefs, and a schedule was set up, which, at the request of counsel, had to be extended. In the meantime, some of the Defendants asked to reopen the record for the filing of additional exhibits, all of which requests were granted.

The Defendants in this cause of action represent longshoremen and warehousemen who load and unload ships at warehouses in ports along the Texas Gulf Coast, at Orange, Beaumont, Port Arthur, Galveston, Texas City, Houston, Freeport, Port Lavaca, Corpus Christi and Brownsville. The membership of each local union in these ports is totally segregated on the basis of race or national origin. Of the thirty-seven local unions which are party Defendants, sixteen locals were for White longshoremen and have no Negro members, and nineteen were for Negro longshoremen and have no White members, and two locals are composed predominantly of Mexican-American longshoremen.

Because of the Texas Right-to-Work Law, all the locals service and refer many non-members. In fact, it was surprising to find that many, many of the longshoremen are not union members, but they work through the local union hiring halls. Under the contracts with the employers, the union gets a certain amount from the employer for every longshoreman, be he union member or not, some of this money going to the pension and welfare funds, and the balance to the coffers of the unions, and even non-union members are entitled to attain seniority as longshoremen and to participate in their pension and welfare plans.

While attempts were made to prove to this Court that a Negro could apply for membership in a White local and vice versa, it is obvious that a Negro does not apply to a White local, and a White does not apply to a Negro local for membership. Negro longshoremen have to be referred out of a Negro local hiring hall, and White longshoremen are referred out of a White longshoremen's hiring hall. While there may have been

exceptions in the past, they have been few and far between. The evidence shows that some coastwise general cargo locals have been merged with some deep-sea general cargo locals in their respective ports. The Negro coastwise general cargo locals have been merged with Negro deep-sea general cargo locals, and the White coastwise general cargo locals have been merged with White deep-sea general cargo locals, this happening since the filing of this action.

It has been stipulated that the I.L.A. chartered the locals on the basis of race, and there is no question that it has maintained these locals on the basis of race, has at all times been aware of their segregated nature and has done nothing to seek their merger, or to charter integrated locals since the passage of the Civil Rights Act.

Negro union officials who testified before the Court have urged the Court not to order a merger. They say that by the maintenance of "sister locals" in every port, the Negroes, by having their own unions and their own union officials, have been able to better themselves by being able to hold high positions in their locals, and have been recognized in the community as a separate, powerful voice for the Negro communities, and has attained for them and the Negro people of the community, a standing which they could not have otherwise attained. The Court believes that they are correct in this assumption, but the ultimate issue before the Court is whether this pattern or practice of having segregated locals is keeping longshoremen, be they Black or White, from equal working opportunities on account of a longshoreman's race or national origin. With the exception of the port of Brownsville, generally the longshoremen's work is divided between the White and Negro locals on a fifty-fifty basis. On its face, this would seem to be a fair shake for the races, but this does not tell the whole story. If in any port there are one hundred Whites available to work on the waterfront as longshoremen and two hundred Negroes, and the

work is divided fifty-fifty between the locals, it is obvious that the one hundred Whites will work more hours than the Negroes. The fifty-fifty rule would be ideal if there were an equal number of White longshoremen to Negro longshoremen in every port, but this is not the case. The same situation would exist if instead of one hundred White and two hundred Negro longshoremen, there would be two hundred White and one hundred Negro longshoremen in a given port. In that situation, the Black longshoremen would work more hours than the White. While the Civil Rights Act of 1964 was passed to aid Negroes and other minorities, it was passed to help Whites as much as Negroes, if their civil rights are being violated, and this Court can foresee where in many situations, now and in the future, the Whites will be asking for the protection of Title VII of the Civil Rights Act of 1964.

The Defendants opposing the proposed merger of the "sister locals" have argued vehemently that the Negroes, whom the Government assumes to protect by this cause of action, are going to be the losers if the Government prevails; that the Negroes in the several ports involved in this lawsuit are getting 50% of the work, even though the racial composition of the communities is far less than 50%. They urge upon the Court that the Government in the construction industry has brought forth the so-called Philadelphia Plan, seeking job opportunities on the basis of the racial ratio in the area and community, and that if this Plan were to be put into effect, Negroes would only have 19% of the work in Houston, 21% of the work in Galveston, 30% in Beaumont, 27% in Port Arthur, 25% in Orange, 12% of the work in Freeport, 5% of the work in Corpus Christi, and only 1% of the work in Brownsville. They are off target in their argument. It is not the racial composition of the community that should control, but the number of Blacks and Whites that make themselves available for longshore work that counts.

From the many Exhibits before the Court, it is obvious that even under the fifty-fifty rule, Negroes, and in some cases Mexican-Americans, having been segregated on the basis of their race or national origin, have been forced to accept a diminished opportunity to earn wages, receive union benefits, work better cargo and otherwise enjoy employment opportunities solely on the basis of their race. A comparison of the earnings of segregated "sister locals" shows that not only the total earnings of the Negro locals, but also the earnings of individual Negro longshoremen, are less than those that work out of the White local.

Much of this disparity is due to the earnings of individual workers on the waterfront who are members of the locals, but who are hired directly by the employers, and who are not referred by the locals, most of whom are Whites, such as the so-called Gearmen. This situation has been known for a long time, and yet the contracts entered into by and between the industry and the longshoremen have not attempted to correct this situation. However, in fairness to the unions, it must be said that they have tried, in most cases, most diligently to give 50% of the work to the Whites and 50% of the work to the Blacks, the trouble lying in the basic fact that the 50% given to the Negroes has had to be divided amongst a greater number of Negro longshoremen.

The Government has urged in this case that the very existence of segregated locals is a "per se" violation of Title VII of the Civil Rights Act of 1964. The Government has already been successful in a similar case in upholding this theory. United States of America v. International Longshoremen's Association, Atlantic Coast District, International Longshoremen's Association, and Locals 829 and 858, I.L.A., Baltimore, Maryland, D.Md.1970, 319 F.Supp. 737. This case has been cited with approval by this Circuit in United States of America v. Jacksonville Terminal Company, 451 F.2d 418 (5 Cir.1971). In that case, the

District Court had held that having segregated locals was not a "per se" violation of Section 703(c) of the Act, 42 U.S.C.A. § 2000e–2(c). United States of America v. Jacksonville Terminal Company, 316 F.Supp. 567 (M.D.Fla.1970). Our Circuit, speaking through Judge Dyer, in reversing the case said:

> "Contrary to the allegations made by the Unions, we find that their locals are not mere 'social clubs', having no influence in national union policy or practice. We conclude that the District Court erred in refusing to hold that the failure to consolidate the locals violates section 703(c) of the Act, 42 U.S.C.A. 2000e–2(c). See United States v. Sheet Metal Workers Local 36, supra at 127–129; Local 53, International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, supra at 1051–55; United States v. International Longshoremen's Association, D.Md.1970, 319 F.Supp. 737, 741–742; Hicks v. Crown Zellerbach Corp., E.D.La.1970, 310 F.Supp. 536; United States v. Local 189, United Papermakers & Paperworkers, E.D.La.1969, 301 F.Supp. 906, 919, aff'd, 5 Cir., 416 F.2d 980."

If the maintenance of segregated locals is a "per se" violation of the Civil Rights Act, there the matter ends, and the relief sought by the Government, as far as ordering the merger of locals in this case, has to be granted. There is no question that segregated locals were so chartered and are still maintained. See also, Musicians' Protective Union Local No. 274, A.F. of M., and James Adams, on his own behalf and on behalf of all others similarly situated v. American Federation of Musicians of United States and Canada, E.D.Pa.1971, 329 F.Supp. 1226.

■■■ However, this Court cannot believe that it was the intention of Congress to condemn all segregated locals. If it were, they could have easily said so. The Government must still show that the maintenance of segregated locals constitutes a pattern or practice depriving individuals of working opportunities, because of their race or national origin. However, in this case, the Government has discharged this burden.

In the case of the port of Brownsville, the White local, which has many Mexican-American members, has been given 75% of the work, and Local 1368, a Negro local, has been given only 25% of the work, and naturally, Local 1368 feels that they should be getting 50% of the work, and is therefore in favor of merger. A history of the Brownsville controversy shows that many of the Negro longshoremen seeking work in the port of Brownsville were recruited from other ports, and the local longshoremen resisted their coming down to take their jobs. The controversy resulted in the establishment of the seventy-five–twenty-five rule. The situation in Brownsville only serves to point out the inequities that can result from segregated locals.

The undersigned Judge is a lifetime resident of Brownsville, Texas, and was present when the first ship came up the Brownsville ship channel to the port of Brownsville, and even though not in the record in this case, if I may be permitted, I will recall the situation of longshoreman work in the port of Brownsville, as I remember it. When having a deep-water port at Brownsville and Port Isabel, Texas, was to become an accomplished fact, a group of men, mostly Anglo, applied for a charter to the I.L.A. The original fight was not so much between Whites and Blacks, as it was between Anglos and Mexican-Americans, who at first were having a hard time getting into the local. There were few Negroes living in the city of Brownsville, and the few that lived there had not been engaged in longshore work. Most of them worked for the railroads, a few were hotel porters, some were barber shop shoeshine boys, and one worked for the Coca Cola Bottling Company. When the Whites applied for a charter, a group of Negroes, in line with the practice of the I.L.A. to have "sister locals", applied for a charter for a Negro local. Most of the membership of the Negro local had to come from outside the Brownsville-Port Isabel area.

The local people comprising the White local and those working out of its hiring hall, naturally resisted the influx of outsiders who took their jobs away from them. This Court is convinced that if the practice of having segregated locals had not been in effect, and the few Negroes who were available for longshore work in the port of Brownsville had been allowed to join the White local, the Brownsville situation would never have arisen.

The concern of the Government in this case with the situation of Mexican-Americans, has been mainly brought about by Local 1576 in Galveston. None of its members are Negro, and there are a few Anglos, and the membership is composed mainly of Mexican-American longshoremen. The charter of this local provides that its members can only work bananas and green fruit. This type of work has been drastically reduced, and the members of Local 1576 have very little work at present. It has been testified that the work of unloading bananas and green fruit is the most difficult, physically, of work done by other deep-sea locals. We have a situation where the members of Local 1576, most of whom are Mexican-American as has been stated above, are able-bodied individuals wanting to do longshore work, but being limited in the opportunity of doing this type of work, because of its charter. It has been shown that they must work out of other hiring halls, instead of their own, but when they appear at said hiring halls, they compete with so-called "casuals", who are not union members. Testimony was received that Local 1576 has taken up the matter of the restriction in their charter with both the District and I.L.A., but the charter remains unchanged. They are not even included in the West Gulf Maritime Association Agreement, even though this has been requested.

There is no question that individuals belonging to Local 1576 have been denied an opportunity to work as longshoremen, because of the restrictions on their charter. Local 1576 is not seeking a merger, but apparently are demanding an equal right to longshore work in the port of Galveston.

Another local that has joined hands with the Government in seeking a merger of the locals is Local 329. Local 329, a Negro local, is only allowed by the I.L.A. to work for four stevedoring companies. At one time, these companies had a lot of business, but the type of cargo they handled has now dwindled, and Local 329 finds itself with very little work. The problems caused by this situation would not exist if all longshoremen at the port of Galveston belonged to one local. Local 329 has for years been asking the District and the I.L.A. for relief, but to no avail. The stevedoring companies have also joined in asking that Local 329 be given more work.

The basic finding that the Court is making in this cause is that the Defendants have chartered and still maintain locals on a segregated basis, that the prevalent rule of dividing the work fifty-fifty between the White and Negro locals violates Title VII of the Civil Rights Act of 1964, because it deprives longshoremen, be they Black or White, Anglo, Mexican-American or Negro, equal working opportunities depending on which group is in the majority in the different ports, and that this will be a continuing violation in the future.

A merger of locals brings with it many problems, which have to be resolved in the issuing of an equitable decree.

The evidence shows that locals own their own property, on which are housed their hiring halls, these properties not being of the same value, as amongst "sister locals". The question of seniority is also present. Although evidence shows that the I.L.A. and the District have insisted that every local have a seniority system, no real attempt at having the same seniority system within every local has been undertaken. Since no standard seniority system has been in practice in all the locals, this poses a terrific problem in modeling an equitable decree. The basic hours the longshoremen have

to work to achieve seniority have differed greatly from one local to another. Since seniority and the hours worked affect the pension and welfare rights of individual longshoremen, the Court has to be mindful of the great necessity of protecting the rights of those who have spent their lives on the waterfront, as compared to those who only work on the waterfront as a sideline.

Nor is this Court satisfied that the only solution to the problem must include a merger of the locals, for a plan or scheme can be devised that would eradicate the inequity of the basic finding made above, unless the opinion in United States v. Jacksonville Terminal Company, *supra*, dictates such a course.

This Court finds that some of the relief sought by the United States is forthcoming. The Defendants, I am sure, do not agree with this conclusion, and an appeal is almost certain.

The Government has submitted to the Court a proposed decree, with which this Court is not in agreement, as in my view, parts of the proposed decree do violence to the Civil Rights Act and my interpretation of the intent of Congress. A decree that orders the merger of the locals will, of necessity, be different than a decree under the Act that does not so provide. I, therefore, certify under 28 U.S.C. § 1292(b) that my findings involve a controlling question of law, as to which there is substantial ground for difference of opinion, and an immediate appeal may materially advance the ultimate termination of this litigation, and it is the hope of the undersigned that the Honorable Circuit Court of Appeals for the Fifth Circuit will accept an appeal under 28 U.S.C. § 1292(b), to determine whether the record in this case entitles the United States to relief, and whether such relief should include an order of merger of the locals involved.

Counsel for the parties will meet to try to formulate a decree for entry in this cause, upon a denial of an appeal under 28 U.S.C. § 1292(b), or a final ruling of the Circuit Court of Appeals for the Fifth Circuit, and within sixty days of either event, either submit a proposed decree agreeable to all, or inform the Court of their inability to submit such decree, with their analysis of the points they cannot agree upon.