**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION et al., Defendants-Appellees.**

No. 74–1053.

United States Court of Appeals, Fifth Circuit.

April 11, 1975.

274

William A. Carey, Gen. Counsel, Joseph T. Eddins, Assoc. Gen. Counsel, Charles L. Reischel, Beatrice Rosenberg, Richard S. Cohen, Asst. Gen. Counsels, Washington, D. C., for plaintiff-appellant.

Warner F. Brock, Chris Dixie, Houston, Tex., D. J. Lerma, Brownsville, Tex., Michael Crawford, Arthur J. Mandell, Herman Wright, Houston, Tex., L. Dewitt Hale, Corpus Christi, Tex., for defendants-appellees.

Before THORNBERRY, GOLDBERG and GODBOLD, Circuit Judges.

GOLDBERG, Circuit Judge:

This suit poses for us, in the year 1975, the question of the legality of maintaining segregated black and white unions. Workers in these unions perform the same basic functions, for the same bosses, in the same ports but do so out of different locals. Defendants claim that this division is no more than an amenity for those who wish to associate with "their own". We believe that the effect, if not the intention, is far more invidious, in that it denies equal opportunities to workers and potential workers, and is thus in violation of 42 U.S.C. § 2000e et seq.

The defendants in this suit are the International Longshoremen's Association, the South Atlantic and Gulf Coast District of the Association and 37 local unions within the State of Texas which are chartered by the Association. Save for one of the locals, all, whether black or white, are opposed to a merger with their "sister" unions within each port.[1]

All of the locals involved in this suit were chartered before the passage of Title VII, the Civil Rights Act of 1964.[2] The unions have had what was admittedly a progressive interracial arrangement when the unions were first chartered. In most of the ports the work was divided on a 50%-50% basis between the black and white locals. There were no wage differentials between those in the white and those in the black locals. The defendants contend, and the plaintiff, the Equal Employment Opportunity Commission, does not dispute, that the union committee, which bargains with the shippers for the labor agreements which control the Texas ports, is made up equally of black and white members. Finally, while in some of the ports the mean take home pay for a white longshoreman is higher than that for a black longshoreman, this is at least in part a function of the fact that black locals have chosen in their own discretion to confer seniority and therefore job eligibility on more men by employing laxer standards.

Nonetheless, the United States in 1969 brought suit,[3] claiming that what was progressive many years ago has become, because of the march of law, illegal now.

---

1. Local 1368, in Brownsville, Texas is made up mostly of blacks with some Mexican-Americans. Brownsville appears to be a special case, in which this union local receives only 25% of the work. It appeals for a "fair share" for its members by whatever means necessary and does not necessarily oppose merger of locals.

2. 42 U.S.C. § 2000e et seq.

3. The suit was originally brought by the Attorney General under 42 U.S.C. § 2000e–6(a), which gave him jurisdiction when he had reasonable cause to believe that a person or group of persons were engaged in a pattern or practice of resistance to the enjoyment of any of the rights secured by the Act. Effective as of March, 1974, this jurisdiction was transferred to the Equal Employment Opportunity Commission by 42 U.S.C. § 2000e–6(c); § 2000e–6(d) continued without abatement all suits brought by the Attorney General by substituting the Commission as the party.

## I

## FACTS

The Government's suit claimed that the pattern of union organization violated 42 U.S.C. § 2000e–2(c)(2), which says that it will be an unlawful employment practice for any labor organization:

[T]o limit, segregate, or classify its membership or applicants for membership or to classify or fail to refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities . . . or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex or national origin.

The plaintiff asked the district court to hold that segregated unions are, per se, a violation of the statute and therefore to order that the paired local unions be merged. The defendants essentially argued that no economic deprivation resulted from the existence of separate locals and therefore that their organizational structure did not violate the law.

In his opinion, United States v. Int'l Longshoremen's Ass'n, S.D.Tex.1971, 334 F.Supp. 976, the district judge found that the maintenance of completely separate unions would, in fact, tend to deprive individuals of employment on the basis of their race. Judge Garza decided that while the 50%–50% rule had the superficial look of equality, in fact it had discriminatory potential:

If in any port there are one hundred Whites available to work on the waterfront as longshoremen and two hundred Negroes, and the work is divided fifty-fifty it is obvious that the one hundred Whites will work more hours than the Negroes. . . .

It is not the racial composition of the community that should control, but the number of Blacks and Whites that make themselves available for longshore work that counts.

334 F.Supp. at 979. However, he declined to find that segregated unions in themselves were in violation of the Civil Rights Act of 1964 and stated that he thought he could shape a decree short of merger which would remedy the economic deprivation. He held the formulation of a decree in abeyance, however, and certified to this Court, under 28 U.S.C. § 1292(b), the question of whether the segregated locals had to be merged.[4]

For reasons known only to it, or perhaps for no reason at all, the plaintiff did not take an appeal but decided instead to enter into negotiations with the unions, still, apparently, maintaining its "merge or no deal" approach throughout. This approach did not result in a resolution of the issues, and on November 6, 1972, a year after Judge Garza entered his first order, the Government made a motion for entry of judgment. In its Memorandum in Support of Plaintiff's Motion for Entry of Judgment, the Government said: "We believe that an Order should be entered requiring merger in the manner suggested by our Proposed Decree, and also requiring the other elements of relief contained in that proposal." A year after this motion on October 1, 1973, the district court entered an Interlocutory Decree which held that the defendants were not required to merge and that "therefore such relief is hereby denied;" and proceeded to hold that the violations of Title VII of the Civil Rights Act of 1964 "can be fully corrected by the abolishment of separate hiring halls and the establishment of a common hiring hall" and by the establishment of

4. 28 U.S.C. § 1292(b) reads, in relevant part:
When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: . . .

common seniority classifications. The Equal Employment Opportunity Commission appeals from this Interlocutory Order.

## II
## JURISDICTION

A panel of this Court denied appellee's motion to dismiss the appeal on February 12, 1974. We agree with that panel's action and believe that the appeal is correctly before this Court.[5] The jurisdictional posture of this case is a peculiar one. The district court's order is definitely interlocutory in nature. It orders the parties to confer in establishing common seniority systems and hiring halls and to submit a plan back to the district court so that it can entertain objections. The order goes on to state that the district court is retaining jurisdiction in the matter with "full power and authority to issue any additional Orders necessary to insure equal employment opportunities . . . ." In so ordering, however, the judge denied the plaintiff's motion for a permanent injunction merging the locals.

28 U.S.C. § 1292(a)(1) provides in relevant part that the courts of appeals shall have jurisdiction of appeals from "interlocutory orders of the district courts of the United States, . . . granting(,) . . . refusing or dissolving injunctions . . . ." In a number of cases we have upheld the appealability of denials of preliminary injunctions. See, e. g., Mercury Motor Express, Inc. v. Brinke, 5 Cir. 1973, 475 F.2d 1086; Southeastern Promotions, Ltd. v. City of Mobile, 5 Cir. 1972, 457 F.2d 340; Smith v. Grady, 5 Cir. 1969, 411 F.2d 181; Dilworth v. Riner, 5 Cir. 1965, 343 F.2d 226; Bd. of Pub. Instr. v. Braxton, 5 Cir. 1964, 326 F.2d 616.

 The only jurisdictional question in the present case is whether § 1292(a)(1) applies to give us jurisdiction of denials of permanent injunctions. We conclude that it does. In Ferrara v. Louisiana, 5 Cir. 1971, 443 F.2d 344, while recognizing our lack of jurisdiction we said ". . . [W]e concede that the denial of a preliminary or permanent injunction is appealable, . . . ." and go on to decide the case by noting "But the critical fact is that plaintiffs in the proceedings on defendants' motions to dismiss merely opposed those motions and did not ask for a preliminary injunction, much less a permanent one." 443 F.2d at 345, 346. Though dicta, Ferrara's language traces the correct path.

First, we note that in granting the jurisdiction to hear an appeal from the denial of an injunction, the statute draws no distinction based upon the type of injunction which a party has requested. Second, to the extent that jurisdiction over only certain interlocutory orders—those involving injunctions—has been granted in furtherance of the general policy against piecemeal appeals, see Andrews v. United States, 1963, 373 U.S. 334, 83 S.Ct. 1236, 10 L.Ed.2d 383, that purpose is as well, or better served, in the adjudication of motion for a permanent rather than a preliminary injunction. In many cases issues will be finally resolved by the grant or denial of a permanent injunction, while no such resolution will stem from a decision on a motion for a preliminary injunction. This will be the case when, as in the present situation, the question of the appropriate remedy is itself a matter of law. Finally, the factor which singles out injunctions as those matters which will be appealable from an interlocutory

5. Indeed, it might appear that once a panel of this Court had made a legal determination that jurisdiction exists, no subsequent panel on its own could make a contrary determination. Rather the original panel's action would appear, at the least, the law of the case, and could not be overruled except by this Court sitting en banc. Nonetheless, this Court has held that the panel deciding the case must make a de novo determination of jurisdiction. We have said: "Although motions to dismiss have been denied under our administrative procedures, the Court of Appeals is not precluded from a further inquiry as to its jurisdiction and is not relieved of the duty to dismiss the appeal if it appears there is no jurisdiction." Austracan, Inc. v. M/V Lemoncore, 5 Cir. 1974, 500 F.2d 237 at 239; see also Cook v. Eizenman, 5 Cir. 1963, 312 F.2d 134 at 136. Thus we must make the independent inquiry above.

order, the potential for irrecompensible injury, Di Bella v. United States, 1962, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614; Baltimore Contractors, Inc. v. Bodinger, 1955, 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233, is just as likely to be present when an injunction is denied or granted for a time period extending beyond the final order in the trial. These considerations compel the conclusion that the appeal at bar is properly before us.[6]

### III

### MERITS

In United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418, we gave comprehensive attention to the evidentiary issues surrounding a showing of discrimination. That opinion dealt in part with the interpretation of section 2000e–2(c)(2), noting that "there appears no valid justification for preservation of these locals as separate entities. The record clearly discloses that the existence of 'separate but equal' locals has had, and may continue to have, post-Act deleterious effects on blacks." 451 F.2d at 457. We ordered the merger of segregated unions, but in doing so did not need to inquire further into the meaning of the statute before us.[7]

Reading § 2000e–2(c)(2) by its literal terms, as we ordinarily do, Perry v. Commerce Loan Co., 1966, 383 U.S. 392, 400, 86 S.Ct. 852, 857, 15 L.Ed.2d 827, 833; Mumford v. Glover, 5 Cir. 1974, 503 F.2d 878 at 882, I believe that the statute puts an extremely heavy burden on those who wish to maintain segregated unions. They must show that this organizational structure would not *tend* to deprive any *individual* of employment *opportunities* or affect his status as an employee.

I conclude that the unions cannot make such a showing, even granting that present longshoremen, whether black or white, are paid the same wages, have equal numbers of representatives on the contract negotiating committee, and, under a common seniority and hiring hall system, could be assured of an equal chance of obtaining longshore work. There are two reasons for this decision. First, black individuals who might potentially seek employment opportunities as longshoremen would tend to be dissuaded by the onus they would then have to bear of working through an involuntarily all-black organization.[8] Second, there is a significant likelihood that the contracts which would emerge from bargaining sessions in which all of labor's representatives were charged with serving all of the employees would better the employment status of present and potential black employees than does a bargaining committee in which half of the representatives are charged with serving white employees and the other half with serving black employees.

#### A. *Stigma*

In Brown v. Board of Educ., 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, in which the Supreme Court held that segregated schools denied to blacks the

---

**6.** We note that dicta in the Supreme Court's opinion in Switzerland Cheese Ass'n v. Horne's Mkt., 1966, 385 U.S. 23, 87 S.Ct. 193, 17 L.Ed.2d 23, is consistent with our conclusion. The Court said: "We take the other view [that the petitioner could not appeal] not because 'interlocutory' or preliminary may not at times embrace denials of permanent injunctions, but for the reason that the denial of a motion for a summary judgment because of unresolved issues of fact does not settle or even tentatively decide anything about the merits of the claim." 385 U.S. at 25, 87 S.Ct. at 195, 17 L.Ed.2d at 25.

**7.** The Court was not presented with motions for remedies short of merger and did not

directly deal with the validity of such remedies.

**8.** The defendants note that there is no requirement within the rules which govern the locals that each local may service only members of its predominant race. But they admit that the locals were chartered on the basis of race, and have been maintained on that basis. As the district court found, the exceptions to this pattern "have been few and far between". 334 F.Supp. at 978. They are functionally segregated; neither this Court nor the statute we are applying would force blacks to undergo the tension and tribulations of joining the predominantly white local before we decide the case.

equal protection guaranteed by the Fourteenth Amendment, the Court said: "To separate [black school children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." 347 U.S. at 494, 74 S.Ct. at 691, 98 L.Ed. at 880. The Court then quoted from the lower court in one of the cases consolidated in *Brown*: "Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group." *Id.* The Supreme Court found that regardless of the equality of the material inputs, segregated schools could not be equal because the very segregation causes psychic trauma to the black children.

The racial stigma which prevents segregated schools from offering equal educational opportunities is not felt exclusively by children, nor is it felt exclusively in the educational context. The Supreme Court subsequently summarily decided a series of cases in which it held that racially separate facilities were inherently unconstitutional; the Court came to those decisions without regard to any evidence of material equality. See, e. g., New Orleans City Park Improvement Ass'n v. Detiege, 1958, 358 U.S. 54, 79 S.Ct. 99, 3 L.Ed.2d 46, aff'g 5 Cir. 1958, 252 F.2d 122 (segregated parks). Gayle v. Browder, 1956, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114, aff'g Browder v. Gayle, M.D.Ala.1956, 142 F.Supp. 707 (segregated sectioning of buses); Mayor and City Council of Baltimore v. Dawson, 1955, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774, aff'g Dawson v. Mayor and City Council of Baltimore, 4 Cir. 1955, 220 F.2d 386 (segregated beaches).

We must address ourselves to the terms of § 2000e–2(c)(2) in light of this judicial recognition of the harm to self-esteem that attaches to many black persons at the prospect of obtaining their goal through an involuntarily segregated mechanism—whether that goal be education, transportation, recreation or, in the present case, employment. Once we do so it becomes apparent to me why the segregated locals currently before us must be merged. The statute says that any segregation which tends to deprive an individual of employment opportunities is illegal. Many black people who are about to embark upon a career will be dissuaded from becoming longshoremen because of the extra burden which attaches to that profession in the form of the psychic discomfort of segregation. That extra obstacle, in other words, tends to deprive them of their opportunity to become longshoremen. It does not matter that many of the blacks currently in the segregated local have come to regard it as a voice of the black community. The effect of such segregation is likely to be viewed as a negative one by many blacks considering potential jobs and so long as one black so views it, the result of the practice is discrimination. Nor does it matter that those who continue the system may not have a discriminatory intent. The statute which we are construing calls for a finding of illegitimacy where the classification tends to effect a denigration of employment opportunities. It does not look to the intention of those who segregate nor to the satisfaction with which they may view the job they have done.

### B. *Negotiations*

The other detriment which blacks will tend to suffer relates to the adverse effect upon their employment status and employment opportunities of the contractual terms which emerge from bargaining sessions in which only some of labor's negotiators are charged with representing their point of view. The problem is well expressed in an analogous case to the present one, faced by the Fourth Circuit:

Abolition of the dual hiring halls and the other reforms decreed by the district court do not eliminate the necessity of merging the locals. The

ILA's failure to secure equal employment opportunities for its black members in all jobs for which they are qualified is an example of the inherent inequality that the district judge correctly concluded can be remedied only by merger. Apart from further litigation, discrimination against black workers who aspire to non-gang jobs, such as gearmen, mechanics, and foremen, can only be accomplished by bargaining with the stevedores. But the officers of the white local owe no duty to the members of the black local, and it is unrealistic to expect them to participate in hard bargaining on behalf of black longshoremen. . . . At best, the union's committee approaches the bargaining table with divided legal responsibilities and loyalties. However, merger of the locals will place on all bargaining representatives, not just black bargaining representatives, the statutory duty to eliminate racial discrimination throughout the Port. Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 203, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

United States v. Int'l Longshoremen's Ass'n, 4 Cir. 1972, 460 F.2d 497 at 501. This reasoning is as relevant in our case as it was in the case before the Fourth Circuit. As Judge Garza noted below:

Much of this disparity [in total earnings by locals] is due to the earnings of individual workers on the waterfront who are members of the locals, but who are hired directly by the employers, and who are not referred by the locals, most of whom are Whites, such as the so-called Gearmen. This situation has been known for a long time, and yet the contracts entered into by and between the industry and the longshoremen have not attempted to correct this situation.

334 F.Supp. at 979.

I believe that this type of discrimination is more likely to be overcome when all of labor's negotiators have the statutory duty to oppose it, as compared to the case when only some will oppose it and others will be willing, at least, to tolerate the discrimination in return for other types of benefits.[9]

Moreover, merger eliminates the possibility of internecine strife between the segregated unions either in the negotiation process or in other phases of union activity. For, where different unions have different interests we cannot be assured of continuing amicable relations. I read another salutary effect of this construction of the statute to be the prevention of any such interunion carnage under black and white flags.

## IV

## CONCLUSION

Plessy v. Ferguson, 1896, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, with all of its "separate but equal" paraphernalia has failed the constitutional test of time for a good reason. The involuntary separation of people engenders a psychological harm which puts the lie to contentions of equality. It is ludicrous to say in the seventh decade of the twentieth century, 20 years after Brown v. Board of Education gave us our forceful education in race relations, as our society and courts have struggled with the great task of cleansing the vicious inequities which have beset our black citizens, that segregated unionism is to receive the statutory or constitutional blessing of our Congress or this Court. Congress would be shocked to hear that their legislation entrenches the inequality *inherent* in segregated locals. And I would not undo twenty years of judicial travail to allow that same result. Unions are not entitled to any separate enclave in our legal and sociological stratification. A union is not a social club; it is a fundamental economic instrument in our society and we have a whole body of law regulating it. The statute we have under consideration is addressed to the potential employment of every citizen as

---

9. In addition, there are, of course, multifarious aspects of the contract negotiation process whose resolution may differentially affect a black employee's status depending on the duties and directions of the negotiators.

well as to post-employment conditions. The segregated unions that we have before us, by their very nature, deny equal employment opportunities and conditions because of the psychological harm they inflict. This is an intolerable situation. Congress designed the statute we have before us to abrogate racism 'and does not allow us to sanctify segregated unions when they perpetuate unequal effects. It may cost some money to merge these unions; there may be some disruption in activities, but I would not ever condemn black workers to the Hobson's choice of living in an involuntarily black niche or foregoing employment opportunities on the waterfront.

I must conclude, then, that the district court erred when it refused to grant plaintiffs' motion for the entry of a permanent injunction against the continued operation of segregated locals. I find that the edict of 42 U.S.C. § 2000e–2(c)(2) cannot be satisfied in the present case by measures short of the merger in each particular port of the racially segregated locals within that port. On that basis I would reverse and remand this case.

Reversed and remanded.

THORNBERRY, Circuit Judge, with whom GODBOLD, Circuit Judge, joins (specially concurring):

We concur in the court's judgment, and in Parts I and II of Judge Goldberg's opinion. In our view, however, the merits of this case can be decided without holding that segregated locals constitute a per se violation of Title VII. As Judge Goldberg notes, p. 275, *ante,* the lower court here specifically found that "the Government has discharged . . . [its] burden . . . [of showing] that the maintenance of segregated locals constitutes a pattern or practice depriving individuals of working opportunities, because of their race or national origin." 334 F.Supp. at 980. In United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418 this court wrote:

The record clearly discloses that the existence of 'separate but equal' locals has had, and may continue to have, post-Act deleterious effects on blacks . . . . We conclude that the District Court erred in refusing to hold that the failure to consolidate the locals violates section 703(c) of the Act, 42 U.S.C.A. § 2000e–2(c).

451 F.2d at 457. We read this language to make merger of segregated locals mandatory whenever they are shown to have had actual discriminatory effect on employment opportunities. Since in this case Judge Garza found that employment discrimination resulted from the existence of segregated locals, *Jacksonville Terminal* left him no discretion to refuse merger. Hence, the order on appeal must be reversed. If a case ever comes to us with a finding by the district court that no actual employment discrimination arose from segregated locals, we may then properly consider the necessity for a rule of per se illegality. On this basis we join the court's judgment.