Alton J. BAILEY, Plaintiff-Appellant,

v.

**RYAN STEVEDORING COMPANY INC., et al., Defendants-Appellees.**

No. 74–2544.

United States Court of Appeals, Fifth Circuit.

March 11, 1976.
Rehearing and Rehearing En Banc Denied June 17, 1976.
See 533 F.2d 976.

Johnnie A. Jones, Baton Rouge, La., for plaintiff-appellant.

George Mathews, Baton Rouge, La., for Ryan Steve. Co., Inc., and Baton Rouge Marine Contractors.

Joseph W. Cole, Jr., Port Allen, La., for Local 1830 of Gen. Longshore Workers, etc.

Robert L. Kleinpeter, Baton Rouge, La., for Rogers Terminal & Shipping Corp., La. Steve., Inc., Ramsay Scarlett Co., Inc., and Baton Rouge Marine Contractors, Inc.

James A. George, Baton Rouge, La., for Local 1833 Gen. Longshore Workers, etc.

C. Paul Barker, New Orleans, La., for Locals 1830 and 1833.

Before COLEMAN and INGRAHAM, Circuit Judges, and O'KELLEY, District Judge.

INGRAHAM, Circuit Judge.

Appellant Alton J. Bailey, a member of Local 1830, filed a civil rights action against five stevedoring companies and two longshore locals charging them with various discriminatory employment practices at the Port of Baton Rouge.[1] In this action in behalf of himself and "other persons similarly situated," appellant sought injunctive relief, declaratory judgment and back pay. The trial court rejected appellant's claims and dismissed his action.

The following issues are presented on appeal: (1) Is appellant entitled to bring a class action in behalf of two hundred and thirty-two members of Local 1830 when two hundred and four members voluntarily state that appellant's claims are unrepresentative of the Local? (2) Is the trial court's finding that appellees were not engaged in discriminatory practices, policies or customs clearly erroneous? (3) Are segregated labor organizations, Locals 1830 and 1833, a violation of the Civil Rights Act?

---

1. Appellant's action is based on Title VII of the 1964 Civil Rights Act. Section 703(c) provides:

(c) It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his face, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

42 U.S.C. § 2000e–2(c).

## CLASS ACTION

■ Instituting this civil rights action under 42 U.S.C. § 2000e–2(c), appellant attempts to advance the interests of himself and "other persons similarly situated." Specifically, the intended class includes "Negro persons who are employed, or might be employed by [the five stevedoring companies named in the petition] . . . or who are members or might be members of LOCALS 1830 and 1833 . . . ." Appellees, however, submitted a voluntary petition to refute appellant's claim of fair representation. 204 of the approximately 230 members of Local 1830 stated in pertinent part:

"We understand Boudreaux, Wells and Bailey claim to represent all black persons employed as longshoremen on the Port Allen docks since 1965 and all black persons who are members of Local 1830.

"We understand they are seeking to join our black Local 1830 and the white Local together.

"We state Boudreaux, Wells and Bailey do not represent us as a class in their effort to integrate the unions. If the unions are integrated, we will lose (1) our right to equal jobs with the whites, (2) our right to elect our own officers and grievance committees, and (3) our rights to our own meetings and a chance to hold office and act for the black longshoremen to protect their interest.

"By maintaining our separate strength and not having it diluted by joining with the white Local we have been able to obtain the same wages, the same number of jobs and equal working conditions, including foremen and other jobs in the Port. If our Locals are put together a few dissatisfied black men can join with the white men and deprive the vast majority of black workers of their jobs and working conditions.

"We do not want these three men, Boudreaux, Wells and Bailey to act for us as a class in this suit and we do not want our Local Union destroyed. We understand that if any of us want to we have the right to join the white union or stay a member of the black union now."

It appears, therefore, that the views of a majority of the black longshoremen are antagonistic with those of the appellant, the would-be standard bearer for the proposed class.

The trial court concluded that "[t]he facts of this case clearly establish that the claims of [appellant] are individual in nature and the issues raised by him are not issues common to any definable class too numerous to sue individually . . . ." and denied the class action under Rule 23, F.R.Civ.P. The suit was viewed, instead, as an individual action by appellant "for no one's benefit but his own."

In *Phillips v. Klassen*, 163 U.S.App. D.C. 360, 502 F.2d 362 at 365–66 (1974), cert. den. 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1975), the court stated:

"It is axiomatic that in order for a class action to be maintainable the representative party must adequately protect the interests of those he purports to represent. The concept is as old as the historic remedy of a class suit and as contemporary as the requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure that 'the representative parties will fairly and adequately protect the interests of the class.' . . . Where courts discern that the interests of the named plaintiff are in significant part antagonistic to those of the class he purports to represent, they decline to entertain the action as a class action."

*See* Wright and Miller, 7 Federal Practice and Procedure § 1768 (1972).

In the instant case we conclude that the trial court did not abuse its discretion in denying the class action. *Cf. Jones v. Diamond*, 519 F.2d 1090, 1097–1101 (5th Cir. 1975). The trial court properly proceeded to dispose of appellant's individual claim that he was victimized by isolated acts and general practices of discrimination. *See Air Line*

*Stewards and Stewardesses Ass'n v. American Airlines, Inc.*, 490 F.2d 636, 640–42 (7th Cir. 1973), *cert. denied* 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 773 (1974). We perceive no reversible error pertaining to the district court's ruling on appellant's attempt to make a class action out of a grievance which is clearly individual in nature.

## EMPLOYMENT DISCRIMINATION

1. *Local Longshore Practices.* Locals 1830 and 1833,[2] organized in 1955, signed their first contract with the Baton Rouge Steamship Association[3] in 1956.

Longshoremen are hired at Port Allen, Louisiana, at "shape-ups"[4] conducted twice daily (7:00 A.M. and 5:00 P.M.) at a single hiring area. They are hired in racially integrated gangs composed of three to sixteen men, depending on the nature of work to be performed.[5] As far as practicable, each gang is composed of an equal number of black and white longshoremen[6] and may work under either a black or white pusher/foreman.

The association maintains employment records that indicate whether the union member was present at the shape-up and whether the member was hired. Preference is conferred on union members within the Local that were present but not hired at previous shape-ups. This priority system is unlike seniority systems that characterize other hiring procedures.[7]

The jobs performed by members of each gang can be categorized according to prestige and difficulty: the most prestigious include foreman, pusher and operator; the less strenuous being flagman, checker and waterboy. The same hourly wage is paid for all categories of work.

■ The district court found no credible evidence to support appellant's con-

2. Local 1830, the senior longshoremen's labor organization, is composed exclusively of black members. Local 1833 is composed entirely of whites. The two racially segregated locals service the same geographic area (Port of Baton Rouge) pursuant to a single contract with Baton Rouge Steamship Association, and the locals operate a single hiring area.

3. The Baton Rouge Steamship Association is an association of six stevedoring companies that operate in the Port of Baton Rouge: (1) Baltimore Stevedoring Company; (2) Baton Rouge Marine Contractors; (3) Capitol City Stevedoring Co., Inc.; (4) Louisiana Stevedores, Inc.; (5) Rogers Terminal & Shipping Corp.; and (6) Ryan Stevedoring Co. (ceased local operations in May 1969).

The association negotiates a single contract with the two locals, both of which are represented during collective bargaining.

4. A "shape-up" is the hiring procedure at the Port of Baton Rouge. Longshoremen assemble in a single hiring area twice each day, and the foreman selects the necessary number of men to compose his gang.

5. A contract between the Locals and the stevedoring association governs the size of a longshore gang:

 (1) general cargo, not less than 16 men;
 (2) utilized cargo for vans, not less than 14 men;
 (3) steel products, not less than 14 men;
 (4) heavy lifts and package steel, not less than 12 men;

 (5) scrap iron, not less than 3 men;
 (6) sacks or bags exceeding 105 pounds, not less than 6 men per side, in addition to a 16 man gang;
 (7) loading grain or meal, not less than 10 men;
 (8) loading soft-trimming grain ships, not less than 5 men per spout; and
 (9) hand trimming, not less than 5 men.

6. According to the "50%–50% rule," a gang working with general cargo would be composed of 8 members from Local 1830 and 8 members from Local 1833. On its face this system appears quite equitable; however, because of continuous fluctuation in the membership of Locals 1830 and 1833, a real threat of discriminatory treatment exists. *See United States v. International Longshoremen's Ass'n*, 334 F.Supp. 976, 978–79 (S.D.Tex.1971) (Garza, J.) A local with twice the membership would employ proportionally fewer of its members than the smaller local. Although the *reality* of discriminatory treatment was not proven in this case, the *threat* or *potential* is obvious and is violative of 42 U.S.C. § 2000e–2(c)(2).

7. A seniority system tends to lock in the effect of past discrimination. *See Stevenson v. International Paper Co.*, 516 F.2d 103, 111–15 (5th Cir. 1975). Port of Baton Rouge priority system is fair only to the extent that the 50%–50% hiring practice will allow; whenever membership imbalance occurs, inequitable treatment is inevitable.

tention that appellees discriminated against blacks in either the volume or the nature of work assigned to longshoremen at the Port of Baton Rouge. Since 1955 there have been eighty-four members of Local 1830 assigned to the foreman and pusher positions. Currently there are more blacks than whites assigned to these preferred positions. Furthermore, since 1956 black members of Local 1830 have been assigned 54% of the longshoremen's work at the Port of Baton Rouge, and since the inception of Locals 1830 and 1833 more blacks than whites have been assigned over 700 hours of work per year.[8]

2. *Appellant's Employment History.* Appellant, a member of Local 1830 since 1959, claims that he has been victimized by a systematic exclusion from the most desirable longshore positions and a restriction on the amount of work assigned. As a result he claims severe financial loss.

The trial court, however, found that although it is undisputed that appellant has averaged fewer work hours per year than other longshoremen, the evidence does not support a contention of employment discrimination. An analysis of appellant's employment record supports the trial court's conclusion:[9]

Also relating to appellant's availability for job assignment, president of Local 1830, Mark Young, testified that "Bailey was more or less motivated by politics. If he had something pending in the court, and he felt a decision was going to be made, or he got some communication or felt like an election was about to come around, he came around. But right after the election or after he lost a case, Bailey was out of sight for as much as a month or a year . . . . Bailey showed up less than the average longshoreman." It is apparent that neither the stevedoring companies nor the union locals discriminated against appellant; rather, it is clear that work was assigned when appellant made himself available. Appellant worked fewer hours than the average longshoreman because he voluntarily elected not to work by absenting himself from the daily shape-ups.

Similarly, the employment decision to exclude appellant from positions of responsibility and special skill (*e. g.*, foreman, pusher and operator) was rationally based. Appellant never applied for admission to the available training programs necessary to qualify for placement in the skilled positions such as crane operator, winch operator and dozer operator. Furthermore, high absenteeism and erratic, antagonistic behavior contributed

8. 700 hours per year is the standard to determine distribution of benefits. After a union member works 700 hours during a contract year, he is entitled to vacation and holiday pay, as well as welfare benefits. Appellant did not prove that the 50%–50% rule *actually* deprived blacks of employment opportunities. He merely established that the system would

tend to result in a discriminatory effect. In this situation he is not entitled to recover back pay.

9. This chart is based on the testimony of Russell Dibenedetto, an employee of the Baton Rouge Steamship Association, who compiles employment records on each longshoreman.

| Employment Status \ Interval | May 7,1972–April 29,1973 [52 weeks] | April 30,1973–Sept.30,1973 [22 weeks] | Oct. 1,1973–March 31,1974 [26 weeks] | Total: May 7,197 March 31, 1974 [100 weeks |
|---|---|---|---|---|
| Hired | 138 | 61 | 48 | 247 |
| Available, But Not Hired | 19 | 0 | 35 | 54 |
| Refused Assignment | 3 | 1 | 1 | 5 |
| Absent From Shape-up | 118 | 56 | 52 | 226 |

to the job placement chosen by the stevedoring companies.[10]

## CONCLUSION

 As noted above, the district court rejected allegations of discriminatory practices, customs and policies. Nevertheless, we conclude that the trial court's conclusion was clearly erroneous, for "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364 at 365, 68 S.Ct. 525 at 527, 92 L.Ed. 746 (1948); *see United States v. Singer Mfg. Co.*, 374 U.S. 174 at 194–95, n. 9, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963). Section 703(c)(2) of the 1964 Civil Rights Act states: "It shall be an unlawful employment practice for a labor organization . . . to limit, segregate, or classify its membership or applicants for membership . . . *in any way which would deprive or tend to deprive any individual of employment opportunities* . . . because of such individual's race, color, religion, sex, or national origin . . .." 42 U.S.C. § 2000e–2(c)(2). This court has construed the Act on several occasions and has required a showing of a "discriminatory effect." *United States v. Jacksonville Terminal Co.*, 451 F.2d 418 (5th Cir. 1971); *Equal Employment Opportunity Commission v. International Longshoremen's Ass'n*, 511 F.2d 273 (5th Cir. 1975); *Local No. 293 v. Local No. 293–A*, 526 F.2d 316 (5th Cir. 1976) [No. 74–3861, 1976].

In *United States v. Jacksonville Terminal Co., supra*, this court ordered amalgamation of racially segregated locals because "[t]he record clearly disclose[d] that the existence of 'separate but equal' locals has had, and may continue to have, post-Act deleterious ef-

fects on blacks." 451 F.2d at 457. The specific discriminatory effect noted by the court was the non-existence of black influence in regional and national union affairs:

> "The BMWE [Brotherhood of Maintenance of Way Employees] Seaboard Federation represents all employees in collective bargaining with the Terminal. Terminal delegates to the Federation convention, where union policy presumably is debated and determined, have always come from the all-white local but have cast one vote for each member of both locals. These delegates have been elected exclusively by members of the white local. Thus we must conclude, and the Union has not disproved, that black BMWE members at the Terminal have had no voice in their bargaining agent's councils. Here, at least, black influence in Federation affairs remains nonexistent."

451 F.2d at 457. Racially segregated locals, therefore, were violative of the 1964 Civil Rights Act, Title VII. *Equal Emp. Op. Com'n v. International Long. Ass'n, supra*, cited the *Jacksonville Terminal Co.* opinion and ordered consolidation of two racially segregated locals. As in the instant case, the longshoremen of the segregated locals were hired according to the 50%–50% rule—a practice which has discriminatory potential. Judge Goldberg stated:

> "I conclude that the unions cannot [show that the organizational structure would not *tend* to deprive any *individual* of employment *opportunities* or affect his status as an employee] even granting that present longshoremen, whether black or white, are paid the same wages, have equal numbers of representatives on the contract negotiating committee, and, under a common seniority and hiring hall system, could be assured of an equal chance of ob-

---

**10.** The trial court specifically recounts from the evidence an incident in its findings of fact:

> "In 1973 the plaintiff had a dispute over not being retained as a flagman on the day following a four hour shift that he worked as such. Instead of filing a grievance or following es-

tablished procedures, the plaintiff, as a result of this dispute, proceeded to sit on the cargo, causing an illegal work stoppage without the consent or approval of his union. This resulted in his being arrested and charged with trespassing."

taining longshore work. There are two reasons for this decision. First, black individuals who might potentially seek employment opportunities as longshoremen would tend to be dissuaded by the onus they would then have to bear of working through an involuntarily all-black organization. Second, there is a significant likelihood that the contracts which would emerge from bargaining sessions in which all of labor's representatives were charged with serving all of the employees would better the employment status of present and potential black employees than does a bargaining committee in which half of the representatives are charged with serving white employees and the other half with serving black employees."

511 F.2d at 277. Judges Thornberry and Godbold specially concurred:

"[T]he merits of this case can be decided without holding that segregated locals constitute a per se violation of Title VII. As Judge Goldberg notes . . . the lower court here specifically found that 'the Government has discharged . . . [its] burden . . . [of showing] that the maintenance of segregated locals constitutes a pattern or practice depriving individuals of working opportunities, because of their race or national origin.' 334 F.Supp. at 980. . . . We read this language to make merger of segregated locals mandatory *whenever they are shown to have had actual discriminatory effect on employment opportunities.* Since in this case Judge Garza found that employment discrimination resulted from the existence of segregated locals, *Jacksonville Terminal* left him no discretion to refuse merger."

511 F.2d at 280. (emphasis added).

*Local 293 v. Local 293–A, supra,* likewise expressly recognizes the necessity to demonstrate an actual discriminatory effect. 526 F.2d 316 at 319, n. 4.

In this case, as in *Equal Emp. Op. Com'n v. International Long. Ass'n, su-*pra, the longshoremen were hired according to the 50%–50% rule. Because of the inevitable fluctuation in union membership, there is a real possibility for discriminatory treatment. Judge Garza recognized the inherent discriminatory potential of the 50%–50% rule:

"With the exception of the port of Brownsville, generally the longshoremen's work is divided between the White and Negro locals on a fifty-fifty basis. On its face, this would seem to be a fair shake for the races, but this does not tell the whole story. If in any port there are one hundred Whites available to work on the waterfront as longshoremen and two hundred Negroes, and the work is divided fifty-fifty between the locals, it is obvious that the one hundred Whites will work more hours than the Negroes. The fifty-fifty rule would be ideal if there were an equal number of White longshoremen to Negro longshoremen in every port, but this is not the case. The same situation would exist if instead of one hundred White and two hundred Negro longshoremen, there would be two hundred White and one hundred Negro longshoremen in a given port. In that situation, the Black longshoremen would work more hours than the White."

*United States v. International Longshoremen's Ass'n,* 334 F.Supp. 977 at 978–79 (S.D.Tex.1971).

We conclude that the district court erred when it refused to grant appellant's motion for permanent injunction against the continued operation of segregated locals. The 50%–50% hiring practice represents a threat of employment discrimination and thus violates 42 U.S.C. § 2000e–2(c)(2), which makes an employment practice unlawful if it "would deprive or tend to deprive" an individual of employment opportunities. It is unnecessary to reach the issue of whether segregated locals represent a *per se* violation of the 1964 Civil Rights Act.

Reversed and remanded.